UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
PEPCO ENERGY SERVICES, INC.,

                                    Plaintiff(s),                    **ORDER**
                                                                     CV07-4809 (WDW)

            -against-


STEFAN F. GEIRINGER and SLG, INC.,
                                    Defendant(s).
----------------------------------------------------------------X
**APPEARANCES:**
Paul A. Friedman
Blank Rome LLP
Attorneys for the Plaintiff
405 Lexington Avenue
New York, New York 10174-0208

Mark F. Werle
Ryan, Smith & Carbine
Attorneys for the Defendants
98 Merchants Row
P.O. Box 310
Rutland, VT 05702-0310

**WALL, Magistrate Judge:**

        Before the court, on consent of the parties, are cross motions for summary judgment.  For

the reasons set forth herein, the plaintiff's motion for summary judgment (DE[40]) is

**GRANTED**, and the defendants' motion for summary judgment (DE[43]) is **DENIED**.  The

court will defer an award of damages and entry of judgment until after a conference to take place

on **November 18, 2009 at 11:30 a.m.**

                                    **BACKGROUND**

        This lawsuit is the second one in which Pepco Energy Services, Inc. ("PES") and Stefan

Geiringer have appeared before me, but the first in which SLG, Inc. is a named party.  *See*

*Geiringer v. Pepco,* CV 05-4172 (WDW)(E.D.N.Y.).  The parties have a long commercial

history together.  I start with a review of the Rule 56.1 Statement and Counterstatement (together, the "56.1 Stmts.") submitted by the parties on the plaintiff's motion for summary judgment. DE[40-1] and DE[36-6].[1]  To the extent that the 56.1 Statement and Counterstatement submitted in relation to the defendants' motion for summary judgment set forth additional material facts relevant to the analysis, they will be cited *infra*.  The court has considered all submissions on both motions in reaching a decision.

The Parties' Business Relationship Prior to the First Lawsuit:

Defendant SLG was formerly known as North Atlantic Utilities (NAU).  Defendant Stefan Geiringer was the president and sole shareholder of NAU and is the president of SLG. NAU sold natural gas, and, prior to 2003, entered into energy-related transactions with PES. Pursuant to those business transactions, NAU became indebted to PES for a "substantial sum of money."  NAU's obligations to PES included a Promissory Note dated November 1, 2001, accounts payable to PES and accrued but unbilled supply costs.  On November 9, 2001, Geiringer signed an Unconditional Guaranty of Payment in favor of PES, providing his personal guaranty of the payment of NAU's obligations to PES, including but not limited to NAU's obligations under the Promissory Note, both the sums then owing and any sums that would become due in the future.  *See* Pl's 56.1 Stmt., DE[40-1] & Defs' 56.1 Stmt., DE[36-6], ¶¶ 4-11. PES states that, as of that date, NAU's indebtedness to PES, including interest, totaled $8,597,197.47.  DE[40-1], ¶12.  The Defendants do not agree, stating that "the discharged debt as

_____

[1]In regard to those Statements, the court notes the defendants' correct objections to some of the uncontroverted facts as lacking in citation to evidence.  Those facts are, nonetheless, uncontroverted by the defendants for the purposes of these motions, and the court will rely on them in determining the motions.

of November 10, 2003, according to PES, was $4,697,978.21." DE[36-6], ¶12. They also state

that, as of November 10, 2003, Geiringer and NAU were not obligated to repay PES. *Id.*, ¶13.

In 2003, NAU agreed to sell some of its assets to PES pursuant to a Bill of Sale,

Assignment and Assumption Agreement between NAU and PES. P Ex. 1. In connection with

the Bill of Sale, Geiringer entered into an Employment Agreement with PES. 56.1 Stmts., ¶14, P

Ex.2. PES asserts that the majority of the assets that NAU sold to PES were gas supply contracts

that NAU had with specified customers, listed on Schedule 1.8 of the Bill of Sale. DE[40-1],

¶15, P Ex. 1. The defendants disagree, stating that "the majority of the assets sold to PES were . .

. NAU's accounts receivable, which reduced the indebtedness by about half, . . . and the Pipeline

Agreements." DE[36-6], ¶15. PES states that the defendants did not sell the pipeline

agreements, but that PES acquired the right to use SLG's gas transportation rights under those

agreements. NAU also transferred the "use of the North Atlantic Utilities name and logo" and its

"good will" to PES and agreed to change its name to SLG, Inc. 56.1 Stmts., ¶¶16-18.

PES asserts that SLG consults on energy issues under the Pipeline Contracts, paying the

pipeline owner for the right to use pipeline capacity, "meaning SLG has a contract under which it

pays in order to be allowed to use a pipeline's capacity for the delivery of gas." DE[40-1], ¶19.

The defendants object to part of this, stating that "SLG does not consult under the pipeline

contracts. The pipeline contracts are long term agreements that have been in place since 1992

with the Pipeline companies." DE[36-6], ¶19. SLG had, at the times relevant to this lawsuit,

contractual rights to use pipeline transportation capacity under three pipeline contracts, which are

associated with three interstate gas pipelines: the Texas Gas pipeline, the Dominion pipeline, and

the Transco, a/k/a Williams, pipeline. SLG allows other entities to use its capacity on the

pipelines for consideration.

PES states that, pursuant to the Bill of Sale, SLG was required to make available to PES "the full transportation quantity that SLG was contractually entitled to under the Pipeline Contracts," and that PES became SLG's agent under the Pipeline Contracts. DE[40-1], ¶22. The defendants note that this statement "is controverted as stated." They say that the Bill of Sale provides that SLG was only to make SLG's capacity available to PES on "and after the Closing Date [of the Bill of Sale] and for the remaining term of the Pipeline Contracts," which contracts were to end on October 31, 2007. DE[36-6], ¶22. Pursuant to various agency documents, SLG appointed PES as its agent under the Pipeline Contracts, and the agency documents enabled PES to use the capacity to which SLG was entitled under the Pipeline Contracts through October 31, 2007. 56.1 Stmts., ¶¶23 & 24. According to PES, the parties agree that the outstanding debt of NAU to PES was $8,597,197.47 as of November 10, 2003, citing to Schedule 9. According to the defendants, Schedule 9 was calculated and drafted by PES post-closing, without any agreement from Geiringer, and NAU's accounts receivable reduced the debt by about half. 56.1 Stmts, ¶25. PES agrees that the debt was reduced by the value of the NAU Accounts Receivable, leaving an outstanding debt (the "Discharged Debt") of approximately $4.7 million as of the time period shortly after the closing of PES's acquisition of NAU assets. 56.1 Stmts., ¶ 26. Pursuant to the Employment Agreement, Geiringer was to be compensated for his employment with PES and the remaining Discharged Debt was to be reduced by a formula based upon Geiringer's sales performance. *Id.*, ¶27.

PES states that the Bill of Sale provided that if the Discharged Debt was not completely satisfied, SLG was required to monetize the Pipeline Contracts and use the proceeds first to pay

off a debt owed by SLG to Williams, and then to satisfy the remaining Discharged Debt. *Id.*,

¶28. PES further states that if monetization of the Pipeline Contracts did not satisfy the

Discharged Debt, the Bill of Sale gave PES the right to either take title to all stock in SLG at its

discretion at any time between January 1, 2008 and November 1, 2010, or to receive payment of

the remaining Discharged Debt in equal installments on November 1, 2009 and November 1,

2010. The defendants do not disagree, but say that PES omitted relevant portions from the cited

section of the Bill of Sale, which states that the "Discharged Debt" shall be further reduced as of

December 31, 2007, by the value of Seller's Pipeline Contract. . ." 56.1 Stmts., ¶29. The

Employment Agreement was to be effective for seven years, but PES had the option to terminate

the agreement at the end of the second, fourth and sixth years. *Id.*, ¶30. PES calculated the

remaining Discharged Debt as of October 31, 2005 at approximately $2,246.732, an amount

contested by the defendants, who state that in the earlier action, Geiringer claimed that PES owed

him money - approximately $1,400,000 in termination benefits and unpaid commissions of

approximately $158,160. *Id.*, ¶31. I turn next to the facts regarding the earlier lawsuit.

The 2005 Action Between the Parties and the Stipulation of Settlement:

On August 4, 2005, Geiringer filed a complaint against PES in state court, alleging that

PES had breached the Employment Agreement. On September 1, 2005, that action was removed

to this court as *Geiringer v. Pepco Energy Services*, CV 05-4172 ("the Prior Action"). On April

4, 2006, PES filed an Amended Answer and Counterclaims, alleging breach of contract, tortious

inducement of breach of contract, and tortious interference with business relationships. The

parties consented to my jurisdiction and a jury trial commenced on October 1, 2007. During that

trial, on October 2, 2007, the parties stipulated to a settlement on the record ("the Stipulation").

P Ex. 4. PES states that the parties "knowingly" settled their claims, and the defendants state that "knowingly" "can be read as implying that Mr. Geiringer knew what PES had in mind at the time of the settlement." *Id.*, ¶¶32-35. The Stipulation was negotiated between Geiringer and Peter Meier, Vice-President and General Counsel of PES, and was handwritten by Geiringer's counsel. The parties, all represented by counsel, "knowingly signed the Stipulation" and it was read into the record in court. The defendants do not disagree, but again note that "knowingly" "can be read as implying that Mr. Geiringer knew what PES had in mind at the time of the settlement." Geiringer executed the Stipulation both as an individual and, on a separate signature line, as President and duly authorized agent of SLG, Inc., and Mark S. Kumm signed the Stipulation as President of Retail Energy Supply and duly authorized agent of PES. *Id.*, ¶¶36-39.

The Stipulation provided, in part:

> On or before Oct 25, 2007, [plaintiff] shall provide PES with a document executed by a party with a credit rating of Triple "B" or above, which will state that the party with the credit rating of Triple "B" or above shall assume all of PES' liabilities under the three pipeline agreements noted in Schedule 1.15 of the Bill of Sale, Assignment and Assumption Agreement ("Bill of Sale") and Amendment Number 1 thereto, to wit
> ○      Texas Gas Transmission Corporation;
> ○      Dominion (CNG); and
> ○      Transco (hereinafter, "the pipelines")
> or [plaintiff] shall provide to [defendant] written releases from the pipelines no later than Oct 25, 2007 releasing PES from all obligations arising from use of the pipelines after Oct 31, 2007.

*Id.*, ¶40, P Ex. 4.

PES interprets this to mean that "the first part of ¶ 1 referred to PES' liabilities for the use of SLG's pipeline capacity." The defendants accuse PES of an attempt to "illogically and ungrammatically slice up this sentence-paragraph," which, they state, is a single sentence and must be read in its entirety. They do not disagree that the first clause of the sentence "relates to a

credit-worth party assuming all of PES' liabilities under the three pipeline agreements," and "admit" that "a credit-worth party, South Jersey Industries, Inc., has assumed PES' liabilities under the pipeline agreements."[2] *Id.*, ¶41.

The plaintiff next asserts that at the deposition of PES' Vice-President and General Counsel, Peter Meier, Meier was asked to explain "PES's thought process behind seeking guarantee(s) in the nature of those specified in Paragraph 1 of the Stipulation." According to PES, Meier explained that PES's "lengthy course of dealings with Geiringer and SLG had resulted in a number of past incidents in which PES incurred unexpected and unpredictable liabilities, which made PES seek additional assurances and protection when dealing with Geiringer and SLG." PES further states that "PES's contractual relationship with Geiringer and SLG had resulted in" a number of liabilities that PES had to assume, citing to the Meier deposition. The defendants state, first, that the inquiry referred to did not elicit the paraphrased response and that in the cited portions of the deposition transcript Meier does not say that "PES had incurred unexpected and unpredictable liabilities," nor do they "explain a lengthy course of dealings with Geiringer and SLG." They also dispute the factual validity of alleged incidents.[3] *Id.*, ¶¶42-44.

The Stipulation further provides that the "parties and SLG, Inc. shall release one another from any and all obligations in the Bill of Sale and Amendment Number 1 thereto and the

---

[2]The defendants' "admission" is one of the contested facts underlying these cross-motions. It is repeated here for background information and is addressed in substance later in this Memorandum and Order.

[3]As explained *infra*, the factual validity of the alleged incidents is not material to a determination of this motion. *See infra,* pp. 32-33.

Employment Agreement, except in the event of [plaintiff]'s failure to perform his obligations under ¶ 1, as set forth in 4, below." The Stipulation also provides that in the event that Geiringer failed to perform his obligations, he stipulated and agreed that the remaining Discharged Debt was $2,200,000; PES would have all its rights under the Bill of Sale and the Employment Agreement, and PES could exercise all rights it might have for Geiringer's breach of the settlement agreement. *Id.*, ¶¶45-46. According to PES, Mark Kumm, who signed the Stipulation for PES, testified at a deposition that the $2,200,00 was derived from PES's calculation of the Discharged Debt that remained after October 31, 2005. The defendants say that Kumm "went on to explain that the amount of $2,200,000 was a number that was stipulated to . . . as did PES's Rule 30(b)(6) witness, Mr. Meier. . ." *Id.*, ¶47.

First Method of Compliance with Stipulation - Party with Triple B Rating:

The first method of compliance set forth in the Stipulation required Geiringer[4] to provide PES with a document executed by a party with a credit rating of Triple "B" or above, on or before October 25, 2007, stating that such party would assume all of PES's liabilities under the three pipeline agreements noted in Schedule 1.15 of the Bill of Sale, Assignment and Assumption Agreement and Amendment Number 1 thereto. *Id.*, ¶66. The defendants maintain that South Jersey Industries is such a party, that it has a Triple "B" rating and that it assumed the relevant liabilities. South Jersey Industries is a holding company that owns certain non-regulated

_____

[4]PES states that "the defendants," that is, Geiringer and SLG, could have complied in these ways. The defendants state that only Geiringer was a party to the earlier litigation. While that is true, the court notes that the Stipulation of Settlement was signed both by Geiringer individually and by Geiringer on behalf of SLG. This was apparently done because it was SLG who had the pipeline rights, not Geiringer individually, and the requirements of the Stipulation could not have been met without SLG's active participation.

entities including South Jersey Energy Services, Marina Energy, South Jersey Energy, South Jersey Appliance and South Jersey Resources Group. It also owns several regulated entities, including South Jersey Gas. South Jersey Resources Group engages in wholesale natural gas marketing and is a limited liability entity, wholly owned by South Jersey Industries.

Kenneth DePriest is a Vice President of South Jersey Resources Group. The defendants state that he is also an employee of South Jersey Industries. In 2006, Geiringer contacted DePriest because the pipeline capacity that PES had been using was going to be relinquished as of October 31, 2007 and Geiringer wanted to find a "new home for that capacity." In the summer of 2007, SLG and South Jersey Resources Group entered into an agreement regarding South Jersey Resources Group's ability to use SLG's pipeline. Prior to October 2, 2007, Geiringer did not disclose the contract with South Jersey Resources Group to PES. Sometime between October 2 and October 25, 2007, Geiringer contacted DePriest and asked him to provide a letter to PES that would guarantee future payments beyond November 1, 2007 and that PES would have no obligations regarding the pipelines after November 1, 2007. Geiringer did not represent to DePriest that the request was the result of the settlement of a lawsuit with PES. *Id.*, ¶¶67-76.

Geiringer testified that when he contacted DePriest, he did not inquire about the credit rating of South Jersey Resources Group, although he understood the Stipulation's requirement that the document had to be signed by an entity with a credit rating of Triple B or above. The defendants "admit" that the credit rating of South Jersey Resources Group "is of no moment, since this entity is not the entity that assumed PES' liabilities under the three pipeline agreements and that, therefore there would be no reason to make such an inquiry." *Id.*, ¶77. PES maintains that South Jersey Resources Group did not have a credit rating in October 2007. The defendants

dispute that, and state that PES agrees that the credit rating of South Jersey Resources Group is of no moment. *Id.*, ¶78.

Geiringer testified that he asked DePriest whether South Jersey Industries had a credit rating of Triple B or above, and DePriest replied that he did not know. On October 12, 2007, DePriest sent an email with an attached letter to Meier. P Ex.s 16 & 17. DePriest described the letter as "stating South Jersey's financial commitment to take over the SLG guaranty on each of the pipelines associated with the SLG transportation." PES describes the attached letter as undated, on South Jersey Industries stationery, and purported to be from DePriest, who was identified as the Vice President of South Jersey Resources Group. The letter stated that as of November 1, 2007, South Jersey Industries would be the responsible party, and its wholly owned subsidiary, South Jersey Resources Group, LLC, would be the agent of SLG, Inc. The defendants object to any implication that the letter was not sent by DePriest or that it was deficient in some way because only his email bore a date and not the letter. DePriest later testified that by "South Jersey" he meant both South Jersey Industries and South Jersey Resources Group. *Id.*, ¶¶79-82.

At some point after sending the email and letter, DePriest learned of the litigation between SLG and PES. On October 18, 2007, Geiringer emailed DePriest and asked him to revise the letter, writing it "on South Jersey Gas stationery, since it is South Jersey Gas that has the Moody's rating." P Ex.18. After receiving the email, DePriest consulted with in-house counsel and with Ira Megdal, Esq. of Cozen O'Connor, and DePriest was told by in-house counsel to ascertain why the company was being asked to furnish the guarantee. DePriest was "unable to comply with the request." *Id.*, ¶¶83-87.

Also on October 18, counsel for PES emailed counsel for the defendants, attaching a revised draft letter, which PES asserted would comport with the terms of the Stipulation. P Ex.19. The draft letter stated that "South Jersey Industries, South Jersey Resources Group, LLC and South Jersey Gas Company shall assume any and all of Pepco Energy Services, Inc.'s liabilities under the (3) pipeline contracts. . . . The undersigned warrants that he is duly authorized to sign this commitment on behalf of South Jersey Industries, South Jersey Resources Group, LLC and South Jersey Gas Company." The defendants acknowledge that PES sent this draft letter, but take the position that PES knew that South Jersey Gas Company, a regulated entity, could not legally sign such a document along with its unregulated sister company. And, they add, the letter stated that the companies would assume PES's liabilities "after October 31, 2007." Geiringer sent a copy of the proposed letter to DePriest on October 24, 2007. P Ex. 20. DePriest testified that the letter could not ultimately be sent because South Jersey Gas either would not or could not involve itself in the proposed transaction. *Id.*, ¶¶88-90.

On October 19, 2007, DePriest emailed Meier another undated letter, stating that DePriest's "superiors" had asked him to advise "as to the PES liabilities PES believes may extend beyond the October 31, 2007 termination of its Agency Agreement with SLG, Inc." P Ex. 21. The "superiors" to whom DePriest referred were counsel. On October 22, 2007, counsel for PES sent defense counsel a letter stating that the draft letter proposed by defendants did not satisfy the Stipulation because none of the parties identified therein had a credit rating of Triple "B" or above. P Ex. 22. The letter further stated that, in fact, "the only company associated with South Jersey Industries with that level of credit rating was South Jersey Gas Company and . . . your letter did not state that South Jersey Gas Company was assuming the liabilities." The

defendants do not dispute the content of the letter, but "strongly controvert the substance of PES' claim that South Jersey Industries did not have a credit rating contemplated by the Stipulation." *Id.*, ¶¶91-93. The credit rating controversy is discussed *infra.*

On October 24, 2007, DePriest emailed Meier and attached another letter. P Exs. 23 & 24. In the email text, DePriest wrote that South Jersey Resources Group was trying to determine what was being asked of it so that it could understand "exactly what exposure we are being asked to commit to." PES states that the attached letter was a draft, and the defendants state that it was not. The letter attached to the October 24 email is from DePriest to Meier, and asks PES, on behalf of DePriest's "superiors, "to advise why South Jersey Resources Group had any responsibility to PES to provide credit assurances, assume certain liabilities, and release PES from any obligations. DePriest testified that his outside counsel prepared this letter. *Id.*, ¶¶94-96.

On October 25, 2007, DePriest emailed to Meier a document described by the plaintiff as a "final undated draft letter." P Ex. 25. The letter was addressed to Meier, from DePriest, on the stationery of South Jersey Industries, and DePriest again identified himself as the Vice President of South Jersey Resources Group. The letter stated in part that:

> As of November 1, 2007, South Jersey Industries (SJI) will be the responsible party and its wholly-owned subsidiary South Jersey Resources Group, LLC will be the agent of SLG Inc. As you know, SJI is also the parent and 100% owner of South Jersey Gas, which has a credit rating above "BBB." Obviously, as of November 1, 2007, South Jersey will assume all of the liabilities as agent for SLG, Inc. In discussions with our credit department, I was informed that SJI has provided in excess of $10 million in parental guarantees to various Pepco controlled entities including $1.5 million to Pepco Energy Services that have fully satisfied all Pepco credit requirements to date.

*Id.*, ¶97.

The next day, on October 26, 2007, DePriest sent Meier a letter on South Jersey Resources Group stationery, advising that an attached letter ( a copy of the draft letter sent on October 25) was "hereby revoked, a nullity, and of no effect. It has not been signed by me, and PEPCO Energy Services, Inc. may not rely upon this letter. In addition please be advised that to the extent that the draft letter made reference to South Jersey Gas Company, the letter was simply stating a matter of fact. South Jersey Gas Company is in no respect involved in any transaction by and between South Jersey Resources Group, LLC; South Jersey Industries; and SLG, Inc." P Exs.25 & 26. DePriest testified that the author of the October 26 letter was either his in-house or outside counsel, who had advised him to revoke the October 25 letter and that the purpose of the October 26 letter was to make clear that South Jersey Gas would not execute an agreement to assume any of PES's liabilities. DePriest testified that the letter was revoked because it referred to South Jersey Gas, which would not guarantee anything, and counsel had told him that he should not have mentioned South Jersey Gas in the letter. *Id.*, ¶¶98-101.

PES maintains that DePriest testified that "none of the South Jersey companies with the credit rating required in the Stipulation ever agreed to provide the guarantee stated in the Stipulation." The defendants object, noting that the Stipulation does not call for any person or entity to provide PES with a guarantee and that DePriest testified that he did not know the credit rating for South Jersey Resources Group or for South Jersey Industries. And, they maintain that South Jersey Industries did have the required credit rating. *Id.*, ¶102. Geiringer testified that DePriest sent the revocation letter because South Jersey Gas Company could not be legally tied to a non-regulated operation such as South Jersey Resources Group. *Id.*, ¶103.

<u>Second Method of Compliance with Stipulation - Releases:</u>

The second method by which Geiringer could comply with the Settlement Stipulation was to obtain written releases from the pipelines no later than October 25, 2007, releasing PES from all obligations arising from use of the pipelines after October 31, 2007. Each of the pipeline companies submitted a letter, but PES maintains that they do not satisfy the requirements of the Stipulation. The court turns its attention to the letters.

The Dominion Letter

Meier received a letter dated October 9, 2007 from Brian Wilson, a Senior Market Development Representative with Dominion Transmission, Inc., stating that "per SLG, Inc.'s request dated September 26, 2007, Pepco Energy Services, Inc.'s agency agreement with SLG, Inc. will terminate October 31, 2007." P Ex. 7. The defendants add that upon termination of that agency agreement, PES had no further obligation to Dominion under the terms of the agency agreement." *Id.*, ¶50. According to PES, the letter did not state that Dominion would release "PES from all obligations arising from use of the pipelines after October 31, 2007. . ." The defendants say that the effect of the letter was to assure PES that it was released from all obligations to Dominion under the agency agreement. *Id.*, ¶51. PES notes that the letter doesn't contain the word "release" and that it was requested on September 26, 2007, before the Stipulation was negotiated and agreed to on October 2, 2007 and that Geiringer did not know on September 26 that PES was going to ask for a release. The defendants do not dispute those facts, but state that the Stipulation does not require that the word "release" be included in any correspondence from the pipelines, and that Geiringer asked for the letter from Dominion because he knew as of September 26 that he was asking South Jersey Resources to become the

14

agent. Geiringer testified at a deposition that he did not know if Wilson was authorized to provide releases. *Id.*, ¶¶52-53. In an e-mail dated October 11, 2007, Meier informed counsel for the defendants that he was of the opinion that the Dominion letter did not constitute a release. DE[40-1], P. Ex. 8.Geiringer testified that he took no further steps to obtain a release from Dominion, and, in his 56.1 Statement, reiterates his position that the letter was, in effect, a release. *Id.*, ¶54-55.

The Williams/Transco Letter

Meier received a letter dated October 5, 2007 from Whitney H. Weiner, Williams Gas Pipeline's Lead Credit Analyst, referencing Williams/Transco's "confirmation of the impending termination of Pepco Holdings Inc's obligation to provide adequate assurance for SLG, Inc. contract #1012255 . . . However, any Guaranteed Obligations related to the Transportation Contract, with regard to the services provided by Transco prior to the termination date, shall remain Guaranteed Obligations until they are satisfied." P Ex. 9. The defendants add that the letter also stated that "Per the terms of Amendment No 1, the requirement to include SLG, Inc. ends October 31, 2007." *Id.*, ¶¶56-57. Geiringer testified that he did not know if Weiner was authorized to provide releases, that the letter doesn't contain the word "release," and that he took no steps to obtain a release from Williams/Transco other than asking for a letter. He maintains that the letter constitutes a release. By letter dated October 9, 2007, Meier informed Geiringer that in his opinion the letter did not constitute a release. P Ex. 10. Meier shared that opinion with the defendants' counsel by email dated October 10, 2007, along with advice on where a "model standard release" paradigm could be found. P Ex. 11. The defendants state that although the Stipulation required the parties to execute general releases, it did not obligate the pipelines to

do so. *Id.*, ¶¶58-62.

The Texas Gas Letters

Meier received a letter dated October 24, 2007 from David Mosely, a Texas Gas VP, stating that Texas Gas "acknowledges termination of PES' responsibility for the Guaranteed Obligations of SLG effective November 1, 2007. P Ex. 12. However, any Guaranteed Obligations related to the Transportation Contract, with regard to the services provided by Texas Gas prior to the termination date, shall remain Guaranteed Obligations until absolute satisfaction." Meier received another letter from Texas Gas, dated October 31, 2007, "replacing" the October 24 letter. P Ex. 13. The new letter was "substantially identical to the earlier letter, but it referred to "Obligations" and not "Guaranteed Obligations." The defendants add that the new letter "addressed in good faith PES's criticism that the Texas Gas letter of October 24, 2007 is limited to termination of guaranteed obligations." *Id.*, ¶¶63-64.

On October 24, 2007, PES's counsel sent counsel for the defendants a letter in regard to the letters from the three pipelines. P Ex. 14. It stated the view that:

> [T]he letters from the pipelines do not constitute releases of PES from obligations arising from the use of the pipelines. As we previously pointed out to you, the letter related to the Transco agreement does not in any way release PES but refers only to the guaranty provided on behalf of PES. Similarly, the Dominion (NG) letter also does not constitute a release but refers only to the agency agreement, not the pipeline agreement, and merely recites certain terms of that agency agreement. Finally, the Texas Gas letter that we received today fails to constitute a release, as it deals only with obligations for which Texas Gas characterizes PES as "guarantor."

*Id.*, ¶65.

The defendants do not dispute that PES sent this letter, but maintain that the letters did release PES from all obligations after October 31, 2007. *Id.*

16

In regard to both methods of compliance, PES states that Geiringer "could not testify as to any additional steps that he or SLG took to comply with the terms of the Stipulation."  CITES The defendants state that since Geiringer complied with the Stipulation, there was no reason for him to take any additional steps and the Stipulation did not require SLG to do anything.  *Id.*, ¶104.  On November 19, 2007, PES instituted this breach of contract action against Geiringer and SLG, claiming that they had failed to comply with the Stipulation of Settlement.  *Id.,* ¶105.

Transfer of SLG Stock:

The Stipulation provided that if Geiringer breached it, PES was entitled to exercise its rights under Amendment Number 1 of the Bill of Sale and the Employment Agreement.  Those rights included, at the option of PES, to either take title to all stock in SLG at its discretion at any time between January 1, 2008 and November 2010 or to receive payment of the remaining Discharged Debt in equal installments on November 1, 2009 and November 1, 2010.  The defendants do not dispute that the Stipulation so provides, but maintain that they did not breach the Stipulation, so no rights were triggered.  *Id.*, ¶¶106-107.  They also maintain that, even if a breach were found, PES has incurred no obligations and thus has not been damaged as a result of any breach.

In a letter dated January 18, 2008, counsel for PES advised counsel for the defendants that Geiringer should "refrain from any actions which would dissipate the value of SLG, Inc. and/or the stock referenced in Section 9" of Amendment Number 1 to the Bill of Sale, inasmuch as Geiringer's alleged breach had reinstated such rights.  P Ex. 28.  PES states that, during his deposition, Geiringer testified that he had "dissipated the ownership of the SLG stock since October 25, 2007."  Geiringer says that the shares of stock that he referred to in his deposition

17

were transferred in November 2006 and that he had specifically stated that it would be correct to say that he had not dissipated the value of SLG, Inc. since October 25, 2007. *Id.*, ¶108-109. PES states that Geiringer owned the total outstanding stock of SLG -100 shares- and that on November 1, 2006 Geiringer transferred five shares of his stock to his daughter Leslie Geiringer and five shares to another daughter, Michelle Werle. On November 19, 2008, Geiringer transferred his remaining 90 shares to an entity entitled the "Stefan L. Geiringer Revocable Trust." Geiringer is a trustee and beneficiary of the Stefan L. Geiringer Revocable Trust. *Id.*, ¶¶111-112.

Based on these facts, the plaintiff seeks entry of a judgment that (1) the defendants breached the Stipulation of Settlement and that they be required to monetize the Pipeline Contracts and use the proceeds to satisfy the $2,200,000 Discharged Debt owed to PES (subject to defendants' remaining debt to Williams, if any); (2) in the event that the monetization of the Pipeline Contracts is insufficient to satisfy the entire $2,200,000 Discharged Debt owed to PES, that PES be entitled to exercise its remaining rights under the Bill of Sale, as provided in the Settlement Agreement, and (3) PES be awarded any other damages, attorneys fees, or costs of suit that this court deems just and proper.

The defendants oppose such judgment, and seek a judgment of their own, dismissing the complaint. In support of their cross-motion, they argue that Geiringer complied in at least one, if not both, of the two ways that the Stipulation provided for assuring that PES would not be liable for pipeline activity after October 31, 2007. In short, PES says that the defendants breached the Stipulation of Settlement and the defendants say that they did not.

# DISCUSSION

## Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.P.* 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 129 (2d Cir. 1996). The applicable substantive law determines which facts are critical and which are irrelevant. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir. 1996) (quoting *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994)). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash &*

*Rubbish,* 85 F. Supp. 2d at 180 (quoting *Celotex,* 477 U.S. at 322). A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ.,* 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

**Breach of Contract**

The gravamen of the motion here is whether Geiringer breached the Settlement Stipulation, as PES alleges, or whether he did not because he complied with one or both of the avenues of compliance set out in that Stipulation. A stipulation is considered to be a contract between the parties and is, thus, "'subject to the general principles of contract construction and interpretation.'" *Dziennik v. Sealift, Inc.,* 2009 WL 3245291 *2 (E.D.N.Y. Sept. 30, 2009) (quoting *United States v. Assets of Revere Armored, Inc.,* 131 F.3d 132 (2d Cir. 1997)). A settlement agreement is also considered a contract and "therefore the same legal principles governing cases involving general contract disputes apply" to them. *Tardd v. Brookhaven Nat. Laboratory,* 407 F. Supp. 2d 404, 420 (E.D.N.Y. 2006).

Under New York law, the elements of a claim for breach of contract are: (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages. *Tardd*, 407 F. Supp. 2d at 420. The "proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Analect LLC v. Fifth Third Bancorp,* 2008 WL 6591810 *6 (E.D.N.Y. September 17, 2008)(internal citations omitted). Here, the parties agree

that a contract exists. And, although the defendants make some claims that the plaintiff did not make a good faith effort to comply with the agreement (*see* DE[45] at 7), there is no real argument that PES did not adequately perform under the Stipulation and the court finds that it adequately performed. Thus, the issues before the court are whether the defendants breached the agreement and whether PES suffered injury as a result. With these principles in mind, I now turn to an examination of the two avenues of compliance set forth in the Stipulation.

**First Method of Compliance - Creditworthy Party Assuming Liabilities**

The first method of compliance called for Geiringer to "provide PES with a document executed by a party with a credit rating of Triple 'B' or above which will state that the party with the credit rating of Triple 'B' or above shall assume all of PES' liabilities under the three pipeline agreements . . ." The document was to be provided on or before October 25, 2007. In his motion, Geiringer argues that "PES received, on October 12, 2007, an emailed letter from Kenneth DePriest, the Vice President of South Jersey Resources Group, by which PES was informed that South Jersey Industries, Inc. ("SJI") would be assuming Defendants' liabilities under the pipeline agreements after November 1, 2007." DE[43-1] at 7-8. I thus turn my attention to the letter of October 12, 2007.

The letter was attached to an email from Mr. DePriest to Mr. Meir, general counsel for PES. P Exs. 16 & 17.The email text states that "attached is a letter stating South Jersey's financial commitment to take over the SLG guaranty on each of the pipelines associated with the SLG transportation

. . . "P Ex. 16, D Ex. C1. The letter itself is undated, on South Jersey Industries letterhead, and addressed to Peter Meir. It states:

Re: South Jersey Resources Group is SLG, Inc's Pipeline Agent as of
    November 1, 2007

Dear Mr. Meir:

    Pursuant to your agreement with Mr. Stefan Geiringer, I understand that you requested that Pepco Energy Services, Inc., ("PES"), be provided with a document showing that SLG, Inc.'s pipeline Agent commencing November 1, 2007 has a Moody's rating of "BBB" or higher.  I also understand from Mr. Geiringer that PES is SLG, Inc.'s current pipeline agent and that PES' agency agreements end as of October 31, 2007.

    As of November 1, 2007, South Jersey Industries will be the responsible party and its wholly-owned subsidiary, South Jersey Resources Group, LLC, will be the agent of SLG, Inc.  Obviously, as of November 1, 2007, South Jersey will assume all of the liabilities as agent for SLG, Inc.

Very truly yours,

Ken DePriest
Vice President
South Jersey Resources Group

 P. Ex. 17, D Ex. C1.

    The letter is curious in a number of ways.  First, it is written on South Jersey Industries letterhead over the name of a vice president for South Jersey Resources Group, with no explanation of the role that Mr. DePriest played in either company.  Further, the letter is undated, although the email attaching it was sent on October 12, thus the reference to it as the "October 12 letter."  Next, it expresses DePriest's "understanding" that PES wanted to be provided with a document showing that the new pipeline agent had a triple B rating, but it is not such a document.  DePriest identifies South Jersey Industries as the "responsible party" and South Jersey Resources Group as the new agent, but he does not anywhere mention their ratings.  Those oddities, do not, however, necessarily amount to a breach of the Stipulation of Settlement.  The Stipulation does not provide that the mandated "document" state the entity's rating, only that it be "executed by a party with a credit rating of Triple 'B' or above which will state that the party

with the credit rating of Triple 'B' or above shall assume all of PES' liabilities under the three pipeline agreements . . ."  That requirement is not met by the letter because it was not "executed" by DePriest, an unambiguous requirement of the Stipulation.  *See H&M Hennes & Mauritz v. Sanska USA Bldg., Inc.,* 617 F. Supp. 2d 152, 156 (E.D.N.Y. 2008)(whether certain language is ambiguous is a question of law properly considered by court on motion for summary judgment). There is no signature at all on the letter, a fact which leads this court to find that it does not meet the requirements of the Stipulation, which specifically calls for an executed document.[5]

The absence of a signature lends support to the idea that the letter was intended as a draft, not a document binding on its sender.  Even if it was not originally intended as a draft, later events lend credence to the finding that it was not the final word on the issue.  On October 14, Geiringer's attorney emailed Meir, referencing the letter and stating that it satisfied " prong '1' of Mr. Geiringer's obligations under the [settlement] stipulation . . ." P. Ex. 16, D. Ex. C2. Apparently, a dispute about the various South Jersey credit ratings and other issues arose, with PES apparently believing that only South Jersey Gas had the credit rating it had demanded.  On October 18, PES's counsel, Paul Friedman, emailed Geiringer's counsel, Mark Werle, sending a draft "of a letter [to Peter Meir] from South Jersey Gas which is revised to comport with the terms of the Stipulation."  P. Ex. 19.  The draft letter stated, in relevant part:

> This is to advise you that effective on and after November 1, 2007 that South Jersey Gas Company will become the responsible party and its wholly-owned subsidiary, South Jersey Gas Resources Group, LLC will become the pipeline agent . . . As such, South Jersey Industries, South Jersey Resources Group, LLC

---

[5]I note, further, that the South Jersey companies apparently agree that an unsigned letter is not binding.  In his revocation letter of October 26, Mr. DePriest listed, as one of the reasons that the October 25 letter was "a nullity and of no effect" was that it was not signed by him.  *See* P. Ex.26.

and South Jersey Gas Company shall assume any and all of Pepco Energy
Services, Inc.'s liabilities under the three (3) pipeline contracts arising from the
use of the pipelines after October 31, 2007 and hereby agree to indemnify and
hold harmless Pepco Energy Services, Inc. from any claims arising under any of
the pipeline contracts arising from the use of the pipelines after October 31, 2007.
The undersigned represents and warrants that he is duly authorized to sign this
commitment on behalf of South Jersey Industries, South Jersey Resources Group,
LLC and South Jersey Gas Company.

P. Ex. 19

On that same date, October 18, 2007, Geiringer emailed DePriest, stating: "Ken - Pepco

has asked whether you would revise the letter and whether it could be written on South Jersey

Gas stationery since it is South Jersey Gas that has the Moody's rating.  If the stationery becomes

a problem, then I believe the content of the letter covers the issue.  I am truly sorry to put you

through all this but it's the only way that I believe that we can finally rid ourselves of Pepco.

Thank you . . ."  P. Ex. 18.  On October 19, DePriest emailed Meir saying that he was in receipt

of a draft letter that Meir wanted DePriest to write, and asking Meir to advise him "as to the PES

liabilities PES believes may extend beyond the October 31, 2007 termination of its Agency

Agreement with SLG, Inc."  He added that he had "been asked by his superiors to ascertain this

information as part of the process of considering your request for any assurances beyond those

that have already been provided."  P. Ex. 21.

On October 22, PES's outside counsel, Paul Friedman, wrote to Geiringer's attorney,

Mark Werle, expressing his dissatisfaction over a number of issues.  In the letter, Friedman

stated, *inter alia*, that the problem with an earlier "draft" letter, presumably the letter of October

12, was that it failed to comply with the Stipulation's "basic term" concerning a triple B rating.

Friedman expressed PES's position that none of the parties identified in that letter, that is, South

Jersey Industries and South Jersey Resources Group, had the requisite rating, and that the only South Jersey company that did have such a rating was South Jersey Gas. He expressed his dismay about DePriest's October 19 email to Meir asking about PES's liabilities, noting that all correspondence was supposed to go to Friedman, not Meir, and listing other perceived problems. P. Ex. 22.

On October 24, the day before the document was supposed to be produced, Geiringer emailed DePriest, attaching a letter and asking if it would be "a letter that you could e-mail to Peter Meir?" P. Ex. 20. That draft letter stated, in relevant part:

> This is to advise you effective on and after November 1, 2007 that South Jersey Gas Company will become the responsible party and South Jersey Industries's [sic] wholly-owned subsidiary, South Jersey Resources Group, LLC, will become the pipeline agent for SLG Inc's three (3) pipeline contracts . . . As such, South Jersey Industries, South Jersey Resources Group, LLC and South Jersey Gas Company shall assume any and all of Pepco Energy Services, Inc.'s liabilities . . . . after October 31, 2007 and hereby agrees to release Pepco Energy Services, Inc. from all obligations arising from the use of the Pipelines after October 31, 2007. The undersigned represents and warrants that he is duly authorized to sign this commitment on behalf of South Jersey Industries, South Jersey Resources Group, LLC and South Jersey Gas Company.
>
> Very truly yours,
>
> Kenneth DePriest
> Vice-President
> South Jersey Resources Group, LLC

P. Ex. 20.

Also on October 24, DePriest emailed Meir, attaching a "follow up letter concerning the data we have been asked to furnish." DePriest notes that he read Friedman's letter and the response from SLG and states that South Jersey Resources was "simply trying to determine what it is that is being asked" of them so that they could "specify exactly what exposure" they were being asked to commit to. P. Ex. 23. The text of the follow up letter was as follows:

Dear Mr. Meir:

        I am in receipt of a draft letter, which you would like me to furnish to you regarding the referenced matter.

        In connection with this request, please advise me as to why South Jersey Resources Group, LLC has any responsibility to Pepco Energy Services, Inc. that would require South Jersey Resources Group, LLC to:

1)   Advise Pepco Energy Services, Inc. that South Jersey Resources Group, LLC has provided credit assurance to interstate pipeline companies;

2)   Assume liabilities of Pepco Energy Services, Inc. under agreements between Pepco Energy Services, Inc. and the interstate pipeline; and

3)   Release Pepco Energy Services, Inc. from any obligations.

        I have been asked by my superiors to ascertain this information as part of the process of considering your request for a letter.

        Please feel free to contact me . . .or have your attorney contact me and we can discuss the relationship between South Jersey Industries and South Jersey Resources Group.

P. Ex. 24.

On October 25, Werle emailed Friedman with a copy of "correspondence from SJI's Ken DePriest to Peter Meir," on which Werle, and apparently not Friedman, had been copied. P. Ex. 25. The attachment, which Werle described as "SLG guarantee letter.doc," was the letter referencing South Jersey Gas. It stated, in part, that:

> As of November 1, 2007, South Jersey Industries (SJI) will be the responsible party and its wholly-owned subsidiary South Jersey Resources Group, LLC will be the agent of SLG Inc. As you know, SJI is also the parent and 100% owner of South Jersey Gas, which has a credit rating above "BBB." Obviously, as of November 1, 2007, South Jersey will assume all of the liabilities as agent for SLG, Inc. In discussions with our credit department, I was informed that SJI has provided in excess of $10 million in parental guarantees to various Pepco controlled entities including $1.5 million to Pepco Energy Services that have fully satisfied all Pepco credit requirements to date.

P. Ex. 25.

As noted earlier, this letter was promptly revoked. The next day, on October 26, 2007, DePriest sent Meier a letter on South Jersey Resources Group stationery, advising that an attached letter ( a copy of the draft letter sent on October 25) was "hereby revoked, a nullity, and

of no effect. It has not been signed by me, and PEPCO Energy Services, Inc. may not rely upon this letter. In addition please be advised that to the extent that the draft letter made reference to South Jersey Gas Company, the letter was simply stating a matter of fact. South Jersey Gas Company is in no respect involved in any transaction by and between South Jersey Resources Group, LLC; South Jersey Industries; and SLG, Inc." DePriest later testified that the author of the October 26 letter was either his in-house or outside counsel, who had advised him to revoke the October 25 letter and that the purpose of the October 26 letter was to make clear that South Jersey Gas would not execute an agreement to assume any of PES's liabilities. DePriest testified that the letter was revoked because it referred to South Jersey Gas, which would not guarantee anything, and counsel had told him that he should not have mentioned South Jersey Gas in the letter. P. Ex 26.

The court has repeated all of these exchanges to illustrate the conclusion that the document referenced in the Stipulation of Settlement was never finalized. It was still hotly contested as of and beyond October 25, 2007, the date by which it was to be produced. Under these circumstances, the court does not agree with Geiringer that the October 12 letter was a final letter. Moreover, even considering it as such, as noted *supra,* it does not meet the basic requirement of being executed. Thus, I find that Mr. Geiringer did not satisfy the Stipulation of Settlement by producing an executed document from a credit-worthy[6] entity. I turn next to the other avenue of compliance, releases from the pipeline companies.

---

[6]The court reaches this conclusion without the necessity of determining what rating PES was looking for or whether either of the South Jersey entities had it. Whether they did or they didn't, the letter doesn't satisfy the Stipulation.

**Alternative Method of Compliance - Releases**

The alternative way in which Geiringer could comply with the Stipulation of Settlement was to provide to PES "written releases from the pipelines no later than October 25, 2007 releasing PES from all obligations arising from use of the pipelines after October 31, 2007." The threshold question is what the parties intended by the word "release" in relation to the pipeline contracts. The plaintiff argues, and the defendants agree, that a release is a written relinquishment of a known right or claim. Pl. Mem. in Supp., DE[40-2] at 12; Def. Mem in Opp., [DE]41 at 12. They do not, however, agree on what sort of release was intended in the Stipulation. PES argues that "a release must contain an explicit, unmistakable, and unequivocal statement by the releasing party that it intends to abandon its right to prosecute a present or future claim against the released party." DE[40-2] at 12 (citing *Golden Pacific Bancorp v. FDIC,* 273 F.3d 509, 515 (2d Cir. 2001)). The defendants argue, on the other hand, that the word "release" in reference to the pipeline contracts is not the sort of formal release discussed in cases like *Golden Pacific.* That level of formality, they argue, was contemplated by the parties when they agreed that "mutual general releases" would be signed when Geiringer satisfied his obligations under the Stipulation, but not when they agreed that the pipeline companies would provide "written releases." They assert that there is "obviously a distinction in the [two] use[s] of the word; the parties did not express an intent to have the same level of formality in the releases obtained from the pipelines" as they did in the mutual general releases DE[41] at 11-12. Applying this reasoning, the defendants conclude that the letters to PES from the pipeline companies "all acknowledge the termination of PES' obligations arising from use of the pipelines after October 31, 2007," the very goal of the Stipulation. Id. at 12.

PES characterizes the defendants' interpretation of the Stipulation as an argument that no "written release" was required, but the defendants do not actually argue that. In any event, the issue isn't whether the pipelines produced a writing, it is whether the letters they sent were the sort of releases intended by the parties when they signed the Stipulation. Even considering the word "release" at the informal level suggested by the defendants, the three letters are not the releases intended by the Stipulation. The plaintiff argues, and the court agrees, that each of the letters merely states the terms of "the pertinent agency agreement," recapitulates the terms of the agency agreements, or restates the nature and duration of PES's obligations. *See* DE[40-2] at 12.

As noted earlier, as part of the transaction between PES and NAU/SLG, PES acquired the right to use SLG's gas transportation rights under the pipeline contracts. The Bill of Sale stated that the contracts were excluded assets, but that [PES] would pay [SLG] "(or directly to the applicable pipeline) the actual cost of transportation (demand and commodity) which is approximately $145,000 per month . . ." DE[40-1], ¶¶1.11 & 4 & Sched. 1.11. Pursuant to three separate agency agreements, PES became SLG's (or NAU's) agent under the contracts, which were set to expire on October 31, 2007. DE[36-1], ¶8; 56.1 Stmts., ¶23; D. Ex. N1-3. As agent under the Texas Gas contract, PES agreed, by an Agency Appointment Form, to, *inter alia,* be "bound by the terms and conditions set forth" in the contract between Texas Gas and SLG. D. Ex. N1. Under a "Customer Designation of Agent" agreement with Dominion, PES agreed to "receive all bills associated with the Identified Service Agreements and will tender payments to Pipeline on behalf of [SLG] . . ." D. Ex. N-2. The Williams/Transco Agency Appointment Form made PES agent, *inter alia*, for "Payment and Refund of Billable Party Commodity/Interest/ Cash-out Charges [and] Payment and Refund of Billable Party Demand Charges." D. Ex. N-3.

Pepco Holdings, Inc, the holding company of which PES is a subsidiary, also signed a Guaranty with Williams/ Transco "to induce [Transco] to commence or to continue to provide service(s) pursuant to the terms and conditions of Pipeline's FERC Gas Tariff for [PES] and/or enter into service agreement(s) . . . in connection therewith. D. Ex.Q. PES characterizes these agency agreements as "mechanical tools, for example, to set up PES for direct billing from the pipelines." DE[36-7], ¶¶9 & 10. With these facts in mind, I return to the term of the Stipulation that required written releases from the pipelines, "releasing PES from all obligations arising from use of the pipelines after Oct 31, 2007," and the pipeline letters submitted in relation to that term.

The October 5, 2007 letter from Williams/Transco confirms "the impending termination of Pepco Holdings Inc's obligation to provide adequate assurance for SLG, Inc contract #1-12255 . . . any Guaranteed Obligations related to the Transportation Contract, with regard to the services provided by Transco prior to the termination date, shall remain Guaranteed Obligations until they are satisfied." DE[40-1], Ex. 9. On its face, this letter fails to satisfy the Stipulation, even under the most casual interpretation of the word "release." The letter refers to the obligations of Pepco Holding Company under the guaranty, and nowhere even mentions Pepco Energy Services. Moreover, it refers only to "Guaranteed Obligations," not to "all obligations," as required by the Stipulation. PES notified Geiringer of these problems by letter dated October 9, 2007, but no further written submission was forthcoming. *See* DE[40-1], Ex. 10. PES also stated, in an email to Geiringer's lawyer dated October 10, 2007, that during the negotiations that led to the Stipulation, Geiringer had drafted a release "to deal only with the guaranty and one other obligation, but that PES specifically responded and required that the release be for 'all obligations." Geiringer and his attorney allegedly consulted on that point "and then agreed,

30

hence the language of the Stipulation." DE[40-1], Ex. 11. The defendants have not contradicted these assertions. Because the Stipulation required that all three pipeline companies provide releases, the failure of even one is a breach of that contract. Nonetheless, I will examine the other letters for the sake of a complete record.

The Dominion letter, dated October 9, 2007, is the briefest of the three. It merely "confirms that per SLG Inc.'s request dated September 26, 2007, Pepco Energy Service's, Inc.'s agency agreement with SLG Inc. will terminate October 31, 2007." DE[40-1], Ex. 7. This is in no way a release of all obligations arising from use of the pipeline after October 31, 2007 and nowhere mentions such obligations. It is merely a statement that the agency agreement would expire on October 31, 2007. The court notes, further, that the letter states that it was requested on September 26, 2009, days prior to the drafting of the Stipulation of Settlement on October 2, 2007. While that fact does not necessarily lead to the conclusion that the letter could not satisfy the requirements of the Stipulation, it lends support to the finding that when it was written, Dominion did not know precisely what the parties intended it to say.

There are two letters from Texas Gas. The first, dated October 24, 2007, was captioned "RE: Termination of Guaranteed Obligations," and it acknowledged "termination of PES' responsibility for the Guaranteed Obligations of SLG effective November 1, 2007. However, any Guaranteed Obligations related to the Transportation Contract, with regard to the services provided by Texas Gas prior to the termination date, shall remain Guaranteed Obligations until absolute satisfaction." This letter, too, does not rise to the level of a release of all obligations. As PES pointed out in a letter to Mr. Werle, the Texas Gas missive deals "only with obligations for which Texas Gas characterizes PES as "guarantor." *Id*. Ex. 14. The second letter from Texas

Gas, dated October 31, 2007, fails to meet the requirement of the Stipulation that it be received by PES prior to October 25, 2007.  Id., Ex. 13.

None of the three letters satisfies the second avenue of compliance with the Stipulation, and the Stipulation was thus breached.  I now turn my attention to the question of damages.

**Damages**

Proof of damages is an essential element of a claim for breach of contract under New York law.  *Tardd*, 407 F. Supp. 2d at 420.  The defendants argue that PES has "admitted that it has not been subjected to any liability, or even the threat of liability arising from use of the pipelines after October 31, 2007," and that "was the intent of the Stipulation."  They urge that neither the releases nor the Triple B rating requirement were "ends in themselves," but were "practical means in a commercial setting to assure PES that it would not be subject to any liability from the use of the pipelines after October 31, 2007."  PES has not been subject to any such obligations, and thus, they argue, "the purpose of the Stipulation has been plainly satisfied," and PES was not harmed.  DE[43-1] at 17-18.  Both PES and the court disagree.

PES has explained its rationale for seeking and obtaining the language in the Stipulation as the result of a "once burned, twice shy" approach to its dealings with the defendants.  Unexpected expenses had arisen in the past, and PES wanted absolute assurance that such surprises would not occur again.  *See supra*, p.7.  Those were the terms of the Stipulation; Geiringer and SLG both agreed to them, and they were not met.  PES agreed to give up its counterclaim against Geiringer in the earlier lawsuit, and it was entitled to satisfaction of the assurances that Geiringer made.  It did not get them.  Under New York law, a defendant's breach is material when it is "so substantial that it defeats the object of the parties in making the

contract; the breach must go to the root of the agreement between the parties." *Metropolitan Nat.*

*Bank v. Adelphi Academy*, 886 N.Y.S.2d 68 (N.Y. Sup. Ct. 2009)(internal citations omitted).

The defendants' breach here meets that standard, and PES was damaged by it. As PES argues,

the fact that it has "not yet experienced a [monetary] loss as a result of defendants' failures does

not excuse their nonperformance." DE[44] at 19.

The timing of this lawsuit also supports a finding that PES was damaged. Geiringer was

obligated to satisfy one of the two avenues by October 25, 2007. PES, which started this action

for breach of the settlement agreement on November 19, 2007 after repeatedly communicating to

Geiringer its dissatisfaction with the efforts at compliance, lost no time in acting. When it started

this lawsuit, the possibility that obligations might arise was temporally significant. The fact that

they have not arisen as this action has made its way through the court system does not alter the

fact of breach. There is no magic date by which PES might have been expected to say that if no

obligation had yet arisen, it was not likely to. And, as PES points out, the statute of limitations

on the agency agreements, as on all contracts, is six years. There yet exists the possibility that

some unexpected obligation will arise. DE[44] at 17-18.

Further, it is immaterial to this issue whether the defendants disagree with the precise

circumstances underlying the earlier, allegedly unexpected expenses caused by Geiringer and/or

SLG and paid by PES. The defendants do not deny that PES had to pay certain obligations, and

do not deny that PES's beliefs about the previous expenses entered into the negotiations about

the Stipulation. Whether PES's fears were unfounded or overstated, part of the intent of the

parties when they entered into the Stipulation was to address those fears, and that is the fact that

is material to these motions for summary judgment. Thus, I find that PES was damaged.

33

The Stipulation sets forth the remedies available to PES in the event of a breach:

3. The parties, and SLG, Inc. shall release one another from any and all obligations in the Bill of Sale and Amendment Number 1 thereto and the Employment Agreement, except in the event of [plaintiff's] failure to perform his obligations under ¶1, above, [plaintiff] stipulates and agrees:

(a) the discharged debt as defined in ¶9 of the Bill of Sale and Amendment Number 1 thereto remaining is $2,200,000.00 and
(b) Δ shall have all its rights under the Bill of Sale and Amendment Number 1 thereto and the Employment Agreement; and
(c) Δ may exercise all rights it may have for [plaintiff's] breach of this settlement agreement.

PES argues that this language establishes that a breach would reinstate the "'Discharged Debt'" under the Bill of Sale in the stipulated amount of $2,200,000 and PES' right to recover such debt." DE[40-2] at 15. The defendants argue that the Bill of Sale Amendment No. 1, par.9 must dictate PES' recourse for the discharged debt remaining. DE[41] at 14. That provision, they argue, provides "convoluted formulae to determine if debt [is] owed," and requires calculation of the remaining debt pursuant to its terms, notably by a reduction in the amount owed that reflects the Accounts Receivable. DE[41] at 14-15. The Stipulation, however, plainly states that in the event of breach, the amount of the discharged debt was to be $2,200,000. The Stipulation refers to the definition of "Discharged Debt" as set out in the Bill of Sale and Amendment Number 1, and PES's retention of its rights under those documents, but the amount of the debt is set forth without ambiguity as $2,200,00, not as some amount to be determined[7]. The only question remaining is how the defendants are to satisfy that debt.

PES states that the Bill of Sale, rights to which were retained by PES in the Stipulation,

_____

[7]The court does not know exactly how that number was arrived at, although the parties report that is was discussed at the depositions of Mark Kumm and Peter Meir. *See* 56.1 Stmts., ¶47.

provides that if the Discharged Debt is not satisfied, SLG would be required to monetize the pipeline contracts and use the proceeds to first pay off a debt owed by SLG to Williams and then to satisfy remaining discharged debt. DE[40-2] at 15, D. Ex. 4. If monetization of the pipeline contracts does not satisfy the debt, PES argues, the Bill of Sale further provides that it has the right to either "(1) take title to all stock in SLG at its discretion at any time between January 1, 2008 and November 1, 2010, or (ii) to receive payment of the remaining Discharged Debt in equal installments on November 1, 2009 and November 1, 2010." *Id.* Thus, PES asks the court to order monetization of the pipeline contracts and, if necessary, to further order that PES may exercise its rights under the Bill of Sale, an exercise that would bring into question whether Geiringer transferred stock in violation of the Bill of Sale's terms.

Because some questions remain regarding the remedies set forth in the Stipulation and the details of the award of damages, including how a monetization would work, whether Geiringer/SLG still owes Williams a debt, and the extent, if any, to which Geiringer's transfers of SLG stock are significant to the award of damages, a conference will be held in Courtroom 820 of the Federal Courthouse in Central Islip, New York on **November 18, 2009 at 11:30 a.m.** The parties are urged to discuss the award of damages prior to that time in an attempt to reach a consensus on these issues. After meeting with the parties, the court will render its damages award and enter judgment.

Dated: Central Islip, New York            **SO ORDERED:**
       October 30, 2009

                                       /s/ William D. Wall
                                       WILLIAM D. WALL
                                       United States Magistrate Judge